UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JOSHUA MOLINA, | Case No. 2:21-cv-0051-KJD-VCF |
| Plaintiff, | ORDER |
| v. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | |
| Defendant. | |

Presently before the Court is Defendant's Motion for Summary Judgment (#21). Plaintiff filed a response in opposition (#22) to which Defendant replied (#26).

**I. Facts**

On April 23, 2019, Plaintiff was driving a 2019 Land Rover SUV traveling west on I-215 east of the Jones Blvd. offramp in the number 3 travel lane. The tortfeasor driver, Chase Dillan Marrs ("Marrs") was traveling directly behind Molina's vehicle in a 2019 Chevrolet Silverado pick-up truck. Molina slowed for traffic ahead. Marrs failed to slow, causing the front of his vehicle to strike the rear of Molina's vehicle. The damage to both vehicles was described as moderate. Both vehicles were driven from the scene.

At the time of the accident, Molina was insured under a policy of motor vehicle insurance issued by State Farm, policy no. 056 1815-D17-28R (the "Policy"). The Policy's uninsured/underinsured motorist ("UM" or "UIM") coverage with each person limits of $50,000. Marrs was insured through Progressive with an each person bodily injury liability limit of $50,000.00.

**Medical Treatment**

Plaintiff first presented for treatment to Dr. Travis Hites, D.C., on April 26, 2019. He

indicated that he was rear ended by the adverse driver while stopped for traffic on the I-215 beltway. He indicated that his vehicle received moderate damage, while the adverse vehicle sustained extensive damage. At the time of impact, he was sitting upright, and the impact caused his body and head to be thrown backward then forward; he was unable to brace. His head was turned to the right and upward. He did not lose consciousness, he was restrained and his airbags did not deploy.

Plaintiff described his prior accident history including a 2007 rollover requiring stitches, an April 7, 2019 frontal impact collision with no injuries, and a 2008 side-swipe. He claimed that all injuries related to other accidents had resolved. Plaintiff's primary complaints were (1) neck pain; (2) neck popping, clicking or clanking sound with neck movement; (3) upper back pain with spasms; (4) middle back pain with spasms; (5) low back pain; (6) jaw pain and clicking; (7) headaches; (8) balance problems; (9) attention problems; (10) very tired or fatigued; (11) sleep difficulties; (12) mood swings; (13) anger; (14) irritability; (15) sleepiness; (16) frustration; and (17) impatience. Plaintiff rated his neck pain at 7/10, middle back pain at 6/10, lower back pain 5/10, and jaw pain at 7/10. Dr. Hites recommended Plaintiff attend DC treatments 3 times per week for the following 4 weeks.

On May 1, 2019, Plaintiff reported to Dr. Rosler at the Interventional Pain & Spine Institute. He noted that no emergency care was required for the accident. He rated his then current pain level at 6-7/10. He reported no injury related to the April 7, 2019 accident. Plaintiff received both cervical and lumbar spine x-rays. His cervical spine x-ray revealed no evidence of fracture with a 1.5 mm of retrolisthesis of the C4 and C5 in extension, and 1 mm of left lateral subluxation. The lumbar x-ray revealed no evidence of fracture, and moderated levocurvature versus tilting with apex at T11.

On July 11, 2019, Plaintiff received MRIs of his thoracic and lumbar spine. His thoracic MRI revealed complex thoracic scoliosis and his lumbar MRI revealed an annular tear at L5-S1, posterior disc bulge at L4-5, central and bilateral paracentral posterior disc protrusion at L5-S1, and mild central spinal canal stenosis at L5-S1.

On July 23, 2019, Plaintiff presented to Interventional Pain & Spine Institute. He noted

1   pain in his head and neck (2/10), mid back (3/10) and left heel discomfort (3/10); no low back

2   pain was noted. Dr. Rosler recommended Plaintiff consider L5-S1 TESI injections.

3        Plaintiff treated with Dr. Hites through August 16, 2019, at which time he received a

4   Final Exam. Plaintiff reported all pain areas had decreased. His neck pain had reduced to 3/10,

5   middle back pain reduced to 2/10, lower back pain reduced to 3/10, and his jaw pain reduced to

6   2/10. He also reported his headaches had resolved. Dr. Hites noted that Plaintiff's chronic

7   conditions had resolved, and thought that he had reached maximum medical improvement.

8        On August 20, 2019, Plaintiff presented to Dr. Kaplan at the Las Vegas Neurosurgical

9   Institute. In addition to his previously described complaints, left heel pain was included in his list

10   of primary complaints at this visit. Despite reporting his pain decreasing at his last DC visit, he

11   indicated he was still suffering from pain in the mid to lower back and along both sides. He also

12   reported some upper gluteal pain. Plaintiff indicated he had been treating with ibuprofen and

13   going to the gym. Dr. Kaplan referred Plaintiff to Dr. Rosler to consider bilateral L5-S1 TESIs to

14   see whether pain decreased, if not they would consider lumbar facet blocks. Kaplan did note that

15   Plaintiff had desiccation and a fissure at the L5-S1 which could be his pain generator.

16        On August 28, 2019, Plaintiff presented to Dr. Rosler at the Interventional Pain & Spine

17   Institute. Plaintiff noted that his neck and back pain had improved, rating them at 2/10 and his

18   left foot discomfort had reduced to 3/10. His lower back pain was now his primary complaint,

19   rated at 4/10. Dr. Rosler recommended Plaintiff go forward with the L5-S1 TESI injections.

20        On September 12, 2019, Plaintiff presented to the Surgical Arts Center, under the care of

21   Dr. Baird. He received bilateral L5-S1 TESIs. His pre-operative pain score was 4/10 and

22   postoperative score was 0/10.

23        On September 16, 2019, Plaintiff presented to Oral & Maxillofacial Surgery. He reported

24   that since the subject accident he experienced stiffness and tightness on the left side of his jaw.

25   He also reported he had difficulty in opening his mouth. The only impression/assessment

26   provided was "MPD/AFP". It was recommended Plaintiff receive Occlusal Orthotic Appliance –

27   EDS.

28        Plaintiff returned to Dr. Kaplan on November 8, 2019. Dr. Kaplan ordered updated MRIs

of the lumbar spine. On December 6, 2019, Plaintiff received the recommended MRI of his lumbar spine. The MRI revealed no significant change from his prior July 2019 study.

On November 14, 2019, Plaintiff presented to Rapid Rehab for physical therapy. He indicated his primary complaints were for low back pain, mostly on the left side from T12 to pelvis. He noted that his pain started in April 2019, after 2 accidents (he indicated first accident resulted in no lasting symptoms). Plaintiff noted that his pain had increased after a cortisone shot and increased physical activity. He indicated that his pain ranged anywhere between 3-7/10. He also noted that in September he suffered a right ankle sprain. His rehab potential was "good". Rapid Rehab recommended Plaintiff receive PT treatment 2 times per week for the following 6 weeks.

On December 19, 2019, Plaintiff received a progress note with Rapid Rehab. Plaintiff reported that he has been doing much better with overall less back pain and only slight burning in posterior hip. He reported no more radiating pain past his buttock.

On December 23, 2019, Plaintiff reported to Interventional Pain & Spine Institute where he reported that his areas of complaint had improved, rating all of them at 2/10. Dr. Rosler recommended Plaintiff continue with PT and to follow-up with Dr. Kaplan as needed.

Plaintiff was discharged from PT on January 15, 2020. He reported that his pain complaints had totally resolved including no remaining radiating pain. He also felt like his gross strength and conditioning had improved.

On April 1, 2020, Plaintiff presented at LVNI. He reported axial back pain on the left traveling to the left hip region, as well as pain in the buttock area. Dr. Kaplan opined that Plaintiff's pain was likely coming from the L5-S1 motion segment. He discussed various treatment options including an L5-S1 fusion, managing the pain, lumbar facet blocks. Plaintiff was going to observe the pain and return if necessary. On April 8, 2020, Las Vegas Neurosurgical Institute ("LVNI") provided a surgical cost letter for a lumbar fusion surgery.

**State Farm Claim Handling**

State Farm received notice of the claim on April 25, 2019 via a phone call from Craig P. Kenny & Associates (the "law firm"). On April 29, 2019, State Farm Claims Representative

1   John Stockman ("Stockman") contacted the law firm which confirmed that the vehicle involved

2   in the accident was a temporary loaner vehicle while the insured vehicle was in the shop for

3   repairs. On May 7, 2019, Stockman wrote the law firm and requested information regarding the

4   claim:

5           - the purpose of the trip;

6           - the police report;

7           - photos and repair estimates for both involved vehicles as we may
8             need accident reconstructionist to assist with our investigation and
              evaluation;
9
10          - copies of any and all scene photos or video in possession of your
              client or your office;

11          - the opportunity to obtain a statement from Joshua Molina on the
12            facts of loss and his prior and current medical status, and the impact
              this loss has had on his life and activities;
13
            - confirmation in writing from the other insurance carrier showing
14            their liability limits, their contact and claim information, and advise
              whether they are handling the property damage portion of Joshua
15            Molina's claim; and
16
            - a statement whether he expects to receive any additional
17            treatments.

18          * * * * *

19          If you would prefer, we can request these medical records directly
20          from his providers.

21          * * * * *

22          Please let us know if you require any additional information from us
            to assist your client in this matter.
23

24       On May 15, 2019, Stockman provided a copy of the Declaration page, noting the

25   UM/UIM coverage of "50/100". Stockman noted the claim was pending medical bills and

26   records. On June 19, 2019, Stockman wrote the law firm and requested a call to discuss the status

27   of Molina's treatment and advised State Farm "welcomed" copies of the medical bills and

28   records and other information discussed in its May 7, 2019 letter. On July 23, 2019, Stockman

noted no response from the law firm. He placed the claim on inactive status, noting it would be reactivated if and when new information if received. On October 13, 2019, Stockman wrote the law firm and repeated the request for the information outlined in its May 7, 2019 correspondence.

On November 13, 2019, State Farm Claims Manager Mark Call, reviewed the file and advised Stockman to continue efforts to obtain medical status. On December 4, 2019, State Farm wrote the law firm and requested a call to discuss the status of Molina's treatment and advised State Farm "welcomed" copies of the medical bills and records and other information discussed in its October 13, 2019 letter. On December 12, 2019, the law firm advised that it no longer represented Plaintiff, who was represented by Cory Kaplan, now with Larson, Zirzow, Kaplan, Cottner ("LZKC"). On January 21, 2020, Stockman wrote LZKC and requested a call to discuss the status of Molina's treatment and advised State Farm "welcomed" copies of the medical bills and records and other information discussed in its October 13, 2019 letter. On March 9, 2020, the claim was again placed on inactive status for lack of response.

On May 20, 2020, State Farm received a time limit demand for the policy limits (the "demand") from the law firm Kaplan Cottner. The demand outlined $28,381.24 in medical specials and included a cost estimate for a future lumbar fusion at a cost of $264,370.00. The demand included verification that Plaintiff had settled the claim against the tortfeasor in exchange for the $50,000 BI limits. On May 22, 2020, Stockman sent correspondence to LZKC acknowledging the demand and requesting additional information, including the photos and property damage estimate for the at fault vehicle, information on the injuries sustained in his 2006 accident, two years of prior medical records, and photos of the vehicle damage for his April 7, 2019 accident. Stockman also advised that after review of the requested documents, it might require an IME or biomechanical analysis.

On May 22, 2020, State Farm Claims Manager Peter Gentile ("Gentile") reviewed the claim. He noted that it appeared the "priors" would be necessary due to the alleged lumbar fusions for this rear end loss as the estimate for the vehicle did not reflect any time for structural or frame repairs. He advised Stockman to complete the evaluation once all the requested

1   documents were received and to request an authorization as needed.

2        On June 21, 2020, Mark Call reviewed the claim and noted the demand was met with a

3   request for additional information. He advised Stockman to continue to obtain information

4   regarding the medical status. On July 24, 2020, Stockman wrote Kaplan Cottner and advised that

5   the evaluation of Plaintiff's claim was pending the information requested in its May 22, 2020

6   letter. He noted no response to the request for additional information and placed the claim in

7   inactive status.

8        On August 26, 2020, Plaintiff's attorney called and advised he would e-mail photos of the

9   property damage so State Farm could consider the UIM claim. He inquired why State Farm had

10   not requested "biomech" information until May 20, 2020. Stockman explained they had

11   requested supporting documents in the May 7, 2019 letter as well. Stockman indicated he would

12   fax a medical authorization so State Farm could request prior medical records. Later on August

13   26, 2020, the law firm advised it would not provide copies of the at fault vehicle. Stockman

14   contacted the law firm to repeat the request for property damage information on the at fault

15   vehicle. The attorney indicated that he did not have it and it was not his job to provide it.

16   Stockman explained it is the insured's obligation to assist with the investigation of the claim and

17   State Farm was requesting they provide this information. That same day, Stockman requested the

18   property damage estimates from Marr's insurer, Progressive.

19        On August 27, 2020, the law firm sent a time limit demand for the policy limits due

20   September 4, 2020. Kyle Cottner ("Cottner") advised that the law firm was diligently attempting

21   to obtain the documentation "which State Farm is legally entitled to" and attached photos of the

22   instant crash and from the prior April 7, 2019 crash. Cottner then advised that State Farm's

23   position that it could not accept or reject the demand was incorrect and opposite of case law.

24   Cottner noted that the law firm had provided "overwhelming" evidence showing that Plaintiff

25   was entitled to payment of the full policy limits. Cottner made various allegations regarding

26   State Farm's alleged "bad faith" and requested State Farm provide all facts supporting its

27   position that the reasonable value of the case is less than the $50,000 policy limit or tender the

28   $50,000 policy limit.

1    Stockman noted that a response to the demand was pending review of new information

2    that it had previously requested. On August 31, 2020, Call reviewed the file and advised to

3    complete an injury evaluation for timely response to the demand. On September 1, 2020,

4    Stockman entered an activity note indicating that he recommended retaining defense counsel to

5    assist with gathering prior medical records, and potentially obtaining an Independent Medical

6    Examination ("IME") of Plaintiff. He noted that Progressive had paid their $50,0000 in policy

7    limits. He also noted that the attorney had not responded to State Farm's request for prior

8    medical records but had agreed to provide a medical authorization. Mark Call approved the plan.

9    On September 2, 2020, Stockman retained Christine Booze ("Booze") of Winner & Sherrod

10   ("W&S") to assist in the investigation and obtain Plaintiff's medical records. On September 3,

11   2020, Booze wrote to Kyle Cottner advising that her firm had been asked to assist State Farm in

12   this matter. She advised that State Farm was not in a position to accept or reject the time

13   restricted policy limits demand as it had not had an opportunity to complete a full and fair

14   evaluation of the claim. She noted that State Farm continues to request additional information for

15   review, including Plaintiff's medical records for two years prior to the accident and medical

16   records related to a multi-car loss in 2006. She also noted that it might be necessary for Plaintiff

17   to undergo a physical examination. On September 21, 2020, Lara Miller ("Miller") of W&S

18   wrote to Kyle Cottner confirming a phone conversation. She advised that State Farm had not had

19   an opportunity to complete a full and fair evaluation of the presented UIM claim. She again

20   attached a medical release authorization and requested Plaintiff provide all medical and dental

21   providers for the past two years (due to the nature of his claim) as well as all imaging centers

22   where he may have had imaging studies.

23       On October 29, State Farm received the reports of Stephen L. G. Rothman, M.D. and

24   Jeffrey C. Wang, M.D. retained on behalf of State Farm to review Plaintiff's medical records.

25   Dr. Rothman reviewed Plaintiff's films and noted various degenerative conditions but opined

26   that none of these were in any way caused by acute trauma. Similarly, Dr. Wang reviewed

27   Plaintiff's imaging and opined that they do not demonstrate any acute traumatic structural

28   injuries, but do show mild chronic degenerative changes, which pre-existed the accident and

1   noted "there is no identifiable specific structural injury to the spine as a result of the accident."

2   He opined that if Plaintiff did not have some spinal symptoms after the accident, he may have

3   sustained a soft tissue strain but after allowing for a reasonable period of time for the strain to

4   resolve, he could no longer attribute any of Plaintiff's subjectively reported spinal symptoms, nor

5   any further treatment for the spine, to be connected to the accident.

6            **State Farm's Claim Evaluation**

7            Stockman evaluated the claim. He reviewed the medical records which indicated that

8   Plaintiff had resolution of nearly all symptoms by January 2020, and showed great core strength

9   with no functional deficits. He also noted that there were causation issues with the recommended

10  fusion, including his prior significant accidents, and that he was requesting property damage

11  photos from the tortfeasor's vehicle for this loss, as well as property damage information from

12  the prior loss to consider mechanism of injury from lower back injections with limited rear

13  impact in this loss. Stockman noted incurred medical specials of $28,381.24 and that he

14  considered medical specials of $13,656.18 as related to the loss. He noted that the expert analysis

15  indicated that Plaintiff recovered from any injuries related to the claim with only mild pain

16  following conservative care and that both experts agreed Plaintiff did not suffer any traumatic

17  injury due to the motor vehicle accident. He also noted the large gap in treatment between

18  January 15, 2020 and April 1, 2020. His final evaluation considered medical specials between

19  $13,656.18 and $28,381.24, past pain and suffering between $10,000 and $32,618.76, for a total

20  claim value between $23,656.18 and $61,000. After applying the bodily injury offset of $50,000,

21  Stockman arrived at a UM claim value between $0 and $11,000.

22           On November 24, 2020, Mark Call reviewed the claim and authorized settlement up to

23  $11,000. On November 24, 2020, Stockman noted that an offer of $8,000 was made. Plaintiff

24  filed his Complaint on December 1, 2020. On December 11, 2020, Winner & Sherrod provided

25  records from Southwest Medical Associates, Plaintiff's primary care provider. These include

26  evidence that Plaintiff suffered from prior back pain, including a 2017 urgent care record for pain

27  to his lower back (8/10) with pain shooting down to the ankle on the right side.

28

**II. Standard for Summary Judgment**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Summary judgment may be granted if the pleadings, depositions, affidavits, and other materials in the record show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A fact is material if it might affect the outcome of the suit under the governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Uncorroborated and self-serving testimony, without more, will not create a genuine issue of material fact. <u>See</u> <u>Villiarimo v. Aloha Island Air Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002). Conclusory or speculative testimony is also insufficient to raise a genuine issue of fact. <u>Anheuser Busch, Inc. v. Natural Beverage Distribs.</u>, 69 F.3d 337, 345 (9th Cir. 1995).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. <u>See Celotex</u>, 477 U.S. at 323. Once that burden is met, the nonmoving party then has the burden of setting forth specific facts demonstrating that a genuine issue exists. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587; Fed. R. Civ. P. 56(e). If the nonmoving party fails to make a sufficient showing of an essential element for which it bears the burden of proof, the moving party is entitled to summary judgment. <u>See Celotex</u>, 477 U.S. at 322-23.

**III. Analysis**

**A. Breach of Contract**

"An insurance policy is a contract." <u>Senteney v. Fire Ins. Exch.</u>, 707 P.2d 1149 (Nev. 1985). "In Nevada, to succeed on a claim for breach of contract a plaintiff must show: (1) the existence of a valid contract; (2) that the plaintiff performed or was excused from performance; (3) that the defendant breached the terms of the contract; and (4) that the plaintiff was damaged as a result of the breach." <u>Patel v. Am. Nat'l Prop. & Cas. Co.</u>, 367 F.Supp.3d 1186 (D. Nev. 2019); <u>see</u> Restatement (Second) of Contracts § 203 (2007). "Whether a party has breached a contract and whether the breach is material are questions of fact." <u>Las Vegas Sands, LLC v.</u>

1   Nehme, 632 F.3d 526, 536 (9th Cir. 2011).

2        Here, there is no dispute about the existence and validity of the contract. The Policy's

3   Uninsured Motor Vehicle coverage provides the following insuring agreement "We [State Farm]

4   will pay compensatory damages for bodily injury an insured [Molina] is legally entitled to

5   recover from the owner or driver of an uninsured motor vehicle." "Uninsured motor vehicle" is

6   defined to include underinsured motor vehicles. The policy further provides:

7           **Nonduplication**

8           We will not pay under Uninsured Motor Vehicle Coverage any
            damages:
9
            1. that have already been paid to or for the insured:
10
                     a. by or on behalf of any person or organization who is or
11                   may be held legally liable for the bodily injury to the insured

12   The policy provides that State Farm will pay the damages Plaintiff is legally entitled to recover

13   from the uninsured motorist, Marrs. In the UIM context, "[l]egal entitlement has been interpreted

14   to mean that the insured must be able to establish fault on the part of the uninsured motorist

15   which gives rise to the damages and to prove the extent of those damages." Pemberton v.

16   Farmers Ins. Exch., 109 Nev. 789, 796, 858 P.2d 380 (1993). Essentially, an insurance company

17   with notice of a claim for UM/UIM coverage essentially steps into the shoes of the alleged

18   tortfeasor and is entitled to assert any defense available to the alleged tortfeasor who caused the

19   accident, including proximate causation, the relatedness of the claimant's medical treatment, and

20   the reasonableness of the expenses associated with that treatment. See e.g. LoMastro v. Am.

21   Family Ins. Group (Estate of LoMastro), 124 Nev. 1060 (2008); Spargo v. State Farm Fire &

22   Cas. Co., No. 2:16-cv-03036-APG-GWF, 2017 U.S. Dist. LEXIS 96823 (D. Nev. June 22,

23   2017); See also State Farm Mut. Auto. Ins. Co. v. Arrington, 192 Ariz. 255, 963 P.2d 334, 338

24   (Ariz. Ct. App. 1998); Voland v. Farmers Ins. Co. of Ariz., 189 Ariz. 448, 943 P.2d 808, 811

25   (Ariz. Ct. App. 1997); Hamm v. State Farm Mut. Auto Ins. Co., 151 Wn.2d 303, 88 P.3d 395,

26   397 (Wash. 2004). This case involves a rear end automobile accident where fault is not an issue.

27   Following the accident, Plaintiff received $50,000 in insurance benefits from the tortfeasor's

28   liability coverage. The remaining issues are whether Plaintiff's medical treatment is related to the

1    subject accident, and whether the value of his damages exceed the $50,000 that he has already

2    received.

3          Defendant State Farm argues that Plaintiff cannot satisfy his burden of proof that his

4    injuries are the direct and proximate cause of the accident, because he did not designate an expert

5    witness who will testify "to a reasonable medical probability" that the injuries that Plaintiff was

6    treated for and that his need for future spine surgery was caused by the April 23rd accident.

7    Plaintiff argues that his treating physicians have been disclosed as potential witnesses before the

8    litigation even began and that, consequently, they are not subject to the extensive reporting

9    requirements of Federal Rule of Civil Procedure ("Rule") 26(a)(2)(B).

10         The parties are each partially correct, though neither party fulfilled their duty of candor to

11   the Court by citing the relevant state of the law in this area. Each party extensively cited cases

12   that predated the 2010 Amendments to the Federal Rule of Civil Procedure 26. See Dixon v.

13   Legacy Transp. Sys., LLC, 2:15-cv-1359-JAD-PAL, 2017 WL 4004412 *3 (D. Nev. September

14   11, 2017) (Judge Leen extensively detailing the effect of the 2010 Amendments). Judge Leen

15   described:

16             The 2010 Amendments to Rule 26(a)(2) now mandate non-retained

17   experts, like treating medical providers who offer opinions based on their "knowledge, skill, experience, training or education" under

18   Fed. R. Evid. 702, 703 or 705 to make the disclosures required by Rule 26(a)(2)(C). Rule 26(a)(2)(C) requires disclosures of "the

19   subject matter on which the written witness is expected to present evidence under Fed. R. Evid. 702, 703 or 705;" Rule 26(a)(2)(C)(i),

20   and "a summary of facts and opinions to which the witness is expected to testify." Rule 26(a)(2)(C)(ii). "The 26(a)(2)(C)

21   disclosure obligation does not apply to facts unrelated to the expert opinions the witness will present." Advisory Committee Notes

22   (2010). A treating physician is still a percipient witness of the treatment rendered and may testify as a fact witness and also provide

23   expert testimony under Fed. R. Evid. 702, 703 and 705.

24             After the 2010 Amendments to Rule 26(a), parties are required to identify the subject matter on which hybrid experts like treating

25   physicians are intended to offer testimony as well as a summary of their facts and opinions. The reporting obligations are less onerous

26   than the ones required by Rule 26(a)(2)(B) for retained experts. However, they are mandatory. Defendants are correct that Rule

27   37(c)(1) sanctions are mandatory unless the failure to timely disclose the expert information required by Rule 26(a)(2)(C) was

28   substantially justified or harmless.

1    Id. at *8.

2        Plaintiff cannot say that the failure to comply with Rule 26(a)(2)(C) was substantially

3    justified. Further, non-movant is required to oppose a motion for summary judgment with

4    specific points and authorities and citations to relevant admissible evidence. See Matsushita, 475

5    U.S. at 587. Here, Plaintiff asserts that two of his treating physicians (Kaplan and Hites)

6    provided reports that substantially comply with the requirements of Rule 26(a)(2)(C). Having

7    reviewed the reports that were produced to Defendants and finding that they substantially

8    comply with Rule 26(a)(2)(C), the Court will allow these two treating physicians to testify,

9    because the failure is essentially harmless. See Dixon, 2017 WL 4004412 *9 (the purpose of

10   Rule 26 is to prevent unfair surprise and conserve resources). Further, the Court will limit their

11   testimony to treating physician/percipient testimony and opinions formed during the course of

12   treatment, and require plaintiff to serve supplemental disclosures for those providers that fully

13   comply with the requirements of Rule 26(a)(2)(C).

14       Based on the conflicting testimony between Defendant's timely noticed experts and

15   Plaintiff's treating physicians, the Court denies Defendant's motion for summary judgment on

16   Plaintiff's claim for breach of contract. A trier of fact must decide if Plaintiff's injuries for which

17   he was treated and/or his need for future surgery was caused by the April 23rd accident. Further,

18   the amount of damages must also be determined by a trier of fact.

19       B. Bad Faith

20       In every insurance contract there is an implied covenant of good faith and fair dealing on

21   the part of both parties. Pemberton v. Farmers Ins. Exch., 858 P.2d 380, 382 (1993). Breach of

22   the covenant of good faith and fair dealing constitutes the tort of "bad faith" when the

23   relationship between the parties is that of insurer and insured. Pemberton, 858 P.2d at 352; U.S.

24   Fidelity & Guar. Co. v. Peterson, 540 P.2d 1070, 1071 (1975).

25       An insured may not institute a bad faith action against an insurer regarding UIM benefits

26   until the insured establishes "legal entitlement" to policy proceeds and unreasonable conduct by

27   the insurer concerning its obligation to the insured. Pemberton, 858 P.2d at 384. Until the insured

28   has established legal entitlement, no claim for bad faith will lie. Pemberton, 858 P.2d at 384. An

1    insured must establish the following elements to be legally entitled to UIM policy proceeds: (1)

2    fault on the part of the uninsured/underinsured motorist; and (2) the extent of damages caused by

3    the uninsured/underinsured motorist. Pemberton, 858 P.2d at 384.

4          The Nevada Supreme Court has defined bad faith as "an actual or implied awareness of

5    the absence of a reasonable basis for denying benefits of the insurance policy." Allstate Ins. Co.

6    v. Miller, 212 P.3d 318, 324 (2009) (citing Am Excess Ins. Co. v. MGM, 729 P.2d 1352, 1354-

7    55 (1986)). Thus, under Nevada law, an insurer breaches the duty of good faith and fair dealing

8    by: (1) acting unreasonably; and (2) with knowledge that there was no reasonable basis for its

9    conduct. Guaranty Natl. Ins. Co. v. Potter, 912 P.2d 267 (1996). Bad faith is not evaluated under

10   a reasonable conduct standard. Pioneer Chlor Alkali Co. v. National Union Fire Ins. Co., 863 F.

11   Supp. 1237, 1243 (D.C. Nev. 1994) ("bad faith involves something more than an unreasonable

12   action, a negligent action, by the insurer"). Instead, bad faith requires awareness by the insurer

13   that no reasonable basis exists for its claims decision ("a mens rea of knowing or reckless

14   intent"). Id.

15         Thus, if the insurer's actions resulted from "an honest mistake, bad judgment or

16   negligence", then the insurer is not liable under a bad-faith theory. Miller, 212 P.3d at 330. A

17   bad-faith claim requires a showing that the insurer acted in deliberate refusal to discharge its

18   contractual duties. Id. (citing to HOA v. Associated Internat. Ins. Co., 90 Cal. App. 4th 335

19   (2001)).

20         Here, Plaintiff's response to Defendant's motion for summary judgment on this claim

21   demonstrates at best there was "a genuine dispute regarding an insurer's legal obligations[.]" Id.

22   In these situations, the Nevada Supreme Court has held that "the district court can determine if

23   the insurer's actions were reasonable." Id. Furthermore, an insurer is not liable for bad faith

24   merely for being incorrect about a claim determination as long as the insurer had a reasonable

25   basis to take the position that it did. Pioneer Chlor Alkali Co., 863 F. Supp. at 1242. From the

26   beginning, the insurer was willing to pay the amount of damages related to this accident.

27   However, the insurer was stymied by Plaintiff's failure to cooperate with the reasonable efforts

28   by the insurer to seek additional medical information. Therefore, the Court dismisses Plaintiff's

1   claim for bad faith (tortious breach of the covenant of good faith and fair dealing).

2        Finally, Plaintiff's claim for breach of fiduciary duty is dismissed with his consent.

3   Further, Plaintiff has failed to adduce any "clear and convincing evidence" of oppression, fraud

4   or malice. See NRS § 42.005. Therefore, the Court grants summary judgment on Plaintiff's claim

5   for punitive damages.

6   IV. Conclusion

7        Accordingly, IT IS HEREBY ORDERED that Defendant's Motion for Summary

8   Judgment (#21) is **GRANTED in part and DENIED in part.**

9   Dated this 23rd day of September, 2022

10

11                          Kent J. Dawson
                            United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28